## ALLEN MATTHEWS *v*. THE STATE.

1. JURY LAW. — The act of 1876, known as the jury law, prohibits the summons of tales jurors within the court-house or yard, but does not authorize a challenge of a juror there summoned. It seems that this prohibition is to be regarded as merely directory, unless its infraction prejudiced the appellant.

2. SAME — CASE STATED. — In a trial for murder, there being a necessity and order for tales jurors, the sheriff summoned one within twenty feet of the court-house, which was situated in an uninclosed public square, used as an open market and public resort, and summoned several others in the same square. *Held*, that the uninclosed square was not the court-house "yard," within the letter or spirit of the jury law of 1876.

3. ACCOMPLICE TESTIMONY — CHARGE OF THE COURT. — Note a state of proof in a murder case on which, it seems, the court below may have favored the accused beyond his legal rights, by instructing the jury to consider whether a State's witness was an accomplice, and, if so found, to require corroboration of her testimony by "other evidence in each material fact necessary to convict," and connecting him with the homicide.

APPEAL from the District Court of Grayson. Tried below before the Hon. J. BLEDSOE.

The prosecution was for the murder of Robert P. McKennie, and the conviction was for murder in the second degree, with the punishment assessed at ninety-nine years in the State penitentiary. The killing occurred in the village of Whitesboro, Grayson County.

Dr. W. W. Graves was the first witness introduced by the State. Knows the appellant, and knew the deceased previous to his death. Is a practising physician, and as such he examined the body of deceased shortly after he was killed, and found three smooth cuts. One was on top and in front of the left shoulder, and two in his breast, one of which cut through the third rib, left of the breastbone; the other was about one inch to the right, and through the breastbone; and all of these wounds came together in the heart. Witness introduced the forefinger of his right hand into these wounds, above the knuckle, and found each to be about four inches in depth, and at least one inch wide. All the wounds seemed to range down, and either one would have produced death. There was no contusion of the wounds, but they were smooth cuts, and must have been given with great force, as one of them severed a rib and bent it in.

A map exhibited was drawn by witness, for the prosecuting attorney, and is, in the main, correct. The witness knew what the proof would be, and drew the map with the view of connecting the appellant with the murder. The knife here exhibited, witness got from William McKennie, some five weeks after the killing, and has had possession of it ever since, until he brought it here into court.

A family servant named Caroline McKennie was next introduced, and testified that she is nineteen years old, and has been raised by the deceased. Has known and been intimate with appellant since last July. About seven o'clock on the night of the killing, the deceased and witness went into the meat-house from the main room of the building, to cover up some meat. Witness put the small brass lamp

in a tin bucket about fifteen inches deep, to keep the wind from blowing it out, and so followed the deceased into the meat-house. The two had to go through an ordinary shed-room and across an entry about eight feet wide, between the shed-room and the meat-house. The door to the meat-house is in the north end. After witness and deceased had got into the meat-house, and witness had set the light down on the floor, deceased called twice to Bobbie McKennie, his grandson, to come and take the light out. After the light was taken out, deceased said to witness, " Old mistress says you are pregnant, and it is powerful bad." He then said he would examine witness, and put his right hand on her abdomen. Witness protested, and asked him to desist. Some scuffling ensued between deceased and witness, and, as deceased turned towards the door, some one rushed into the meat-house, caught the deceased, and seemed to push something up against his breast. Witness ran out across the entry, and as she turned and looked back at the door of the shed-room, she saw the appellant run out of the meat-house and turn west. Witness then saw the deceased attempt to sit down, in doing which he fell back. Witness then screamed, and ran west until she passed the south-west corner of the shed-room, which is on the south side of the main building. Witness then turned along the west end, by the chimney in the west end of the main house, and went to the gate, about twenty yards from the main front-door. Witness kept up the screaming until she got to the gate, when she met the appellant on the outside of the gate. Appellant there and then told witness to keep quiet, as he did it, and asked witness not to tell. To this request witness replied that she would tell, if God spared her life.

From here appellant went north-east, and witness ran on in a nearly eastern direction, towards the residence of Mr. William McKennie, son of the deceased. Meeting this gentleman, she told him that his father had fallen down, and was told by him to go on in his house, and stay with his

wife.   Witness remained awhile, and went back to the meat-house, where the body of deceased was lying.   Witness got down by him, cried, "took on," and took his hand in her lap.   From here, A. K. McCarty and others took witness out a few steps west of the house, and, in the presence of J. R. Diamond and others, said to her: "You know who did the killing, and you must tell."   Witness replied that she did not know, when McCarty told her she must not tell him a, lie.   Witness responded that she would not tell a lie; that she did not know; but that it was a tall, heavy man.   Witness then returned to the body, but shortly was again taken off a few steps by McCarty, and charged with knowledge,. and again questioned as before.   Witness again denied knowledge, though she did know, having seen appellant by the light from the shed-room, and been told by him that he did it.   She did not tell, because appellant asked her not to.   Witness was again allowed to return to the body, but; was again taken out by McCarty and others, south of the house.   She refused at first to go, but McCarty slapped her, and dragged her some distance from the house.   The questioning and charges of knowing were reiterated, and witness is not certain whether she then confessed that it was. the appellant, or whether she said she *believed* it was him. Witness had been previously asked if it was not a man named Morris, who once lived near the deceased, and was. at enmity with him; and she had also been asked if it was. not appellant.   Witness was then taken south by the crowd, on to the prairie, and shoved down by one Bessent,. who put his foot on her neck.   Witness was then cursed, and asked who did it.   Witness does not remember, but. thinks she said she believed it was appellant.   The party shot pistols around her after she got up, called for a rope, threatening to hang her.   Witness thinks she then said she believed it was appellant.   Witness saw no rope.

The crowd then took witness to the house of Joe Harris,. and examined her, finding one or two specks of blood on

the left skirt of her dress. Witness then said she got the spots of blood on her as she ran out of the meat-house, by the deceased; but she now says she got them on her when she was squatting down by the body. Witness was then taken to the calaboose. On the next night, some one whom she did not know came to the window of the calaboose, and said to witness that he was the cousin of the appellant, and if she would tell him all about it he could protect both witness and appellant; and about this time the crowd commenced a noise at the door, cursing and swearing that she knew, and should tell, and then for the first time she said it *was* the appellant. Witness had previously said that she *believed* it was appellant.

Referring to the conversation south of the house, witness does not positively remember whether it was then or after she was taken to the prairie that she first said she *believed* it was appellant, but knows that it was not until after McCarty slapped her. Neither witness nor any other person screamed in the meat-house, nor did the witness know of any other than herself screaming any where else. Deceased did not scream, nor did he say any thing. Witness is positive that when screaming she started west, going around the west end of the house. Witness was released from confinement on the Tuesday after the Saturday on which the deceased was killed.

Witness had frequently been about the house of William McKennie during several months prior to the killing, and had access to it as one of the family. Witness once before saw the knife now exhibited. It was then in the possession of appellant, who lent it to witness to peel an apple with, in the barn, during last December. Witness thinks it was the same knife, though she does not identify it by any special marks. Witness and appellant used frequently to meet together. If the appellant had any ill-will towards the deceased, witness did not know it. It was witness, and not Bobbie McKennie, who carried the light into the meat-

house, and it was the latter who carried it out. Deceased asked witness which meat she was using, and she showed him. She was in the habit of cutting the meat with a butcher-knife, which she had washed and put in the safe on the night of the killing, — before the killing, but after supper. It positively was not in the meat-house that night. Witness had been somewhat insolent to deceased, and would quarrel back when he quarrelled at her. Witness's intimacy with appellant was a guilty one, and the two had frequent intercourse at the barn, and "out around." She is now pregnant with child by the appellant. The killing occurred in Whitesboro, Grayson County, Texas.

William McKennie, a son of the deceased, testified that he lived east of his late father's residence. On the evening of the killing, on hearing screaming, he went towards his father's, and on the way met the last witness, who told him that his father had fallen down. She was told by witness to go in and stay with his wife. Witness went on, and found deceased lying dead in the meat-house, with three wounds on his body, — two being in the breast and one in the shoulder. The deceased raised the last witness, Caroline. She has always been a family servant, and had access to witness's house as one of his family. She had lately grown insolent to the father of witness, and witness had been apprehensive of trouble on account of it. During the last November, some one gave a pocket-knife to witness's little boy, which by his mother had been put in a box on the mantel-piece. In December the knife was looked for, and could not be found. It was the same sort of knife as the one exhibited in court, and when witness first saw the knife exhibited, he said it was the same knife which his wife had put in the box on the mantel, and which had been lost. Witness now says it was the same sort of a knife. The pocket-knife exhibited was given to witness by Mrs. Wallace, and he gave it to Dr. Graves. Does not know where it came from. Witness went to his door when he

heard the first scream. This was presently repeated, and shortly became continuous, and was done by the witness Caroline, whom witness met some seventy yards from the house of deceased.

The witness Eaton testified that he lives on the next block, and west of the residence of appellant's father. On the night of the killing, witness heard some one call at his gate, and presently appellant knocked at his door, and was admitted. He appeared out of breath and much excited, and said he feared there was something wrong at deceased's house, as he heard screaming there ; and asked witness to go with him there. When witness and appellant got half-way, they met Conway, who said that he was hunting McCarty, and that McKennie was killed. Appellant wanted witness to go on to the house of deceased, but witness refused, saying that he was going to hunt McCarty, the son-in-law of deceased. Appellant then tried to get one of Conway's sons to go with him to deceased's house, but the boy refused. Appellant seemed much excited, and finally started off alone in the direction of deceased's house. Witness went with Conway to hunt McCarty. Appellant told witness, when he came to his house, that he was just coming from town when he heard the screaming, and stopped in to get witness to go with him to the house. Witness is not friendly with the father of the appellant.

Dicus, sworn, testified that about dark, on the night of the killing, he was going between the house of the deceased and Main Street, in Whitesboro, and heard the appellant get over the fence in the rear of his father's premises, and go south in the direction of Water Street, which runs east and west, in front and north of the house of the deceased. This was about fifty yards from the house, and about half-way along the south string of the appellant's father's fence, as shown by the maps in this case.

James Haley testified that on the night of the killing, about dark, he was about fifty yards south of deceased's

house, on Church Street, which runs north and south by the said house, when the appellant passed him, going south, in the direction of the church. In a short time appellant returned, and in course of some unimportant conversation called the witness a " summer coon." The appellant passed on, going in a northerly direction, towards the house of the deceased, and witness went on in the house, on the east side of the street. Witness was telling his father about seeing and talking with appellant, when the screaming was heard. Not more than five minutes had elapsed since witness and appellant had separated. Witness, when he heard the screaming, went up to the deceased's house, and saw the body.

Mrs. Wallace, who now lives on the place formerly occupied by the deceased, testified that, about five weeks after the killing, she called her little girl to come into the house from where she was playing, in the south-east corner of the lot. The child brought a pocket-knife, which she had found while playing there. It had the small blade open, and the large blade nearly open. Witness gave the knife to Mr. William McKennie, and it is the same here exhibited. The lot of ground is clean, and there is no obstruction. It had been previously raining, and was muddy when the child was playing and found the knife as described.

Mrs. Taylor testified that from her house, on Main Street, about one hundred and fifty yards from the house of deceased, about dark on the night of the killing, she heard the voice of some one crying, " O Lord, my God! " Witness then went around the corner of her house, and saw some one running along the east string of appellant's father's fence. He continued to run until he struck Main Street, when he turned west, passed the gate of defendant's father, and disappeared from the view of witness. The distance to where witness first saw him was about one hundred yards, and the nearest point was about fifty yards. Witness could not possibly tell who it was, as it was dark; thinks that

the voice she first heard was that of a man, and in a few minutes she heard a female voice screaming.  Witness first saw the man near the corner of appellant's father's fence, about half-way between where deceased was killed and the house last mentioned.  He ran on to the north-east corner of the fence of the house mentioned, and then turned west until he passed by the house, going in the direction of Eaton's house, which is west therefrom.

William Davis testified that he knows both the appellant and the pocket-knife.  He saw the latter the day before the killing, in the possession of the appellant, and tried to swop for it.  He thinks the appellant has had it for about one year, — ever since witness has known him.  Identifies the knife by the shape of the little blade, and by its being loose in the rivet; no other marks peculiar about it.  Witness has seen knives like it, but does not remember having seen one like it in Whitesboro.  The blade of the knife is about one-half inch wide, and about three inches long.

Boswell, sworn, testified that he saw the knife exhibited, in the possession of appellant, on the day previous to the killing.  Thinks this is the knife, though there is nothing peculiar about it.  Identifies it only by the small blade being loose at the rivet, and recognizes it as the same knife he saw appellant have.

Witness examined the witness Caroline McKennie, on the night of the killing, but found no arms on her.  Found only two small splotches of blood on the skirt of her dress.

Conway, sworn, testified that he lived about seventy yards south-east from the house of deceased.  About seven o'clock on the night of the killing, witness heard a scream, as if coming from the meat-house of the deceased, and for a few minutes a considerable scuffling appeared to ensue.  Presently witness heard another scream, as of some one in distress, which sounded like a man's voice; and then, after the scuffling had continued for a little time, every thing seemed quiet for about five minutes, when witness heard a

woman's scream, and saw a woman run out from between the meat-house and shed-room, on the east end of the house. She turned around the east end of the main building and shed-room, and ran, screaming, through the gate, turning in the direction of William McKennie's house. Witness then ran over, and found deceased on the floor of the meat-house, dead. His son, William McKennie, was there. Witness then started to hunt McCarty, and met appellant and Eaton about half-way from deceased's to Eaton's house. Witness told them of the death of deceased. Appellant did not seem any more excited than Eaton and witness. Witness and Eaton then went to hunt McCarty, and appellant went towards the house of deceased. Witness returned in a few moments, and found the appellant among the crowd which had gathered about the premises of deceased, and noticed nothing peculiar about his deportment.

Any one going out west between the meat-house and shed-room could not have thrown the knife in the direction of the south-east corner of the lot without running back and going south, so as to get south of the meat-house, or by going north far enough to get beyond the shed-room and main house, and that would have brought the party near the front gate. One could have thrown the knife in the direction of the south-east corner of the lot from the east end of the entry between the meat-house and shed-room, and where witness saw the woman first when she screamed. If the witness Caroline had gone out at the west end of the entry, and around the west end of the house, when she was screaming, witness could not have seen her until she got near the front gate, because the meat-house and other houses would have obstructed the view of the witness. Witness is positive that he saw some one come out at the east end of the entry, and go around the east end of the house.

Gussie McKennie, sworn, testified that he is a grandson of deceased, and is twelve years old. Witness was in bed,

in the front room, when deceased and witness Caroline McKennie started into the meat-house to cover up meat. Witness's little brother, Bobbie, carried the light as far as into the shed-room, and stopped. When witness heard deceased and Caroline get into the meat-house, he heard a scuffle commence immediately, and heard some one say to Bobbie take the light away. When Bobbie came back with the light, witness told him to go back with it, and see if deceased was not whipping the witness Caroline. Witness paid close attention, and when Bobbie went back with the light, he heard a man's voice again tell him to take it away. It sounded like a man's voice, but it was not the deceased's. Witness was familiar with the voices of deceased and the witness Caroline, and knows it was the voice of neither of them. Witness then heard some thing heavy fall in the meat-house, when the witness Caroline came out of the meat-house, screamed, and went around the east end of the house, screaming. Witness knows the light was not carried into the meat-house, and knows that Bobbie carried the light. The knife exhibited looks like the knife that witness's mother put in a box on the mantel-piece. Witness heard no one come out of the meat-house and run around the west end of the house.

Bobbie McKennie testified that he was nine years old. He carried the light as far as the shed-room, when the deceased and witness Caroline went into the meat-house to cover up meat. The deceased and Caroline went across the passage into the meat-house, and as soon as they got in there, witness heard a scuffle commence, and some one, not in the voice of either the deceased or Caroline, ordered witness to go back with the light. Witness then went into the front room, when his brother Gussie told him to go back and see if deceased was not whipping Caroline. . When witness got back into the shed-room the scuffle was still going on, and witness was again ordered to go back with the light. Witness then heard a heavy fall, and saw a man run out of

the meat-house and start west, and then Caroline ran out and followed right after him, screaming as she went. The witness Caroline did not come back across the entry to the shed-room door, or witness would have seen her. Witness thinks the pocket-knife here exhibited is the same he owned, and which his mother put in a box on the mantel, from where it was missed. Witness knows that the voice that ordered him to take the light back was not the voice of either deceased or Caroline. When the witness was told to take the light back the first time, and just as he started to do so, he saw a man run into the meat-house, and just after he was told the last time to take it away, he saw a man run out. The butcher-knife which Caroline used in cutting the meat, witness saw in the safe, its customary place, next day.

J. R. Diamond testified that, having heard of the killing on the night it occurred, he went to the house, and found deceased on the floor of the meat-house, dead. One foot seemed to be drawn up under deceased, and the other was just outside the threshold. The shutter of the door of the meat-house opened back, east, against the wall, and there was blood spattered all over the shutter, and a small pool of blood on the entry floor between the meat-house and shed-room door. The gashes in the breast of the deceased appeared to be about one or one and a half inches long, and were smooth-cut, not over an inch apart, and seemed to range down. The floor of the entry is about eight inches lower than the floor of the meat-house. The deceased was a larger man than the appellant, who is an ordinary man, about five feet five or six inches high, and of about one hundred and thirty pounds weight.

Witness was present when McCarty talked to Caroline, west of the house. Witness heard McCarty charge her with knowing who did the killing, and she said she did not. McCarty then told her not to tell him a lie, and she responded that she would not; that it was a tall man, but

she did not know him.   She said the same thing north of
the house.   Witness saw appellant examined, and there
was nothing found on his person but a small Barlow knife.
There was no blood on it, nor was there any blood found on
his person.   There were two small spots of blood found on
the right side of Caroline's dress.   Witness was present on
the day after the killing, when some two or three hundred
men hunted in the lot of deceased to see if a knife could
be found.   The lot was bare and clean, with nothing on its
surface that could hide any thing.   The north-east corner of
the lot was very muddy.   It had been sown in barley in the
fall.   On the night of the killing, a strong west wind was
blowing.   The deceased was aged about seventy years, and
was a stout old gentleman.

J. R. Love testified that he was the constable of Whites-
boro precinct, and heard the two conversations between
McCarty and Caroline, which transpired substantially as
detailed by Diamond.   Witness examined Caroline, and
found a spot of blood on the front of her dress.   Also
arrested appellant at the body, in the meat-house ; and upon
examining him, found no blood on his person, nor any other
weapon than a small Barlow knife, which had on it no stains
of blood.   It was perhaps a half-hour after the killing
when witness arrested the appellant.   Nothing peculiar or
unusual was apparent in the demeanor and appearance of
the appellant, more than with the others around.   He
denied knowing any thing about the killing, and said all he
wanted was a fair trial.   There was a great deal of excite-
ment about there.

The appellant was kept at Whitesboro, confined, that and
the next night, and on Monday was brought to jail, and has
not been at liberty since.   Witness knows that Caroline was
released from confinement on Tuesday following the killing,
since which time she has been at liberty.   Witness joined
with perhaps two hundred others in the search of the lot for
a knife, but none was found.   Witness thinks if there had

been a knife on the ground, it would have been found, as there was nothing on the ground to hide any thing. Caroline told witness, in explanation of the blood found on her dress, that deceased threw it on her with his hand, as she passed him going out of the meat-house.

Dr. W. E. Saunders testified that he is a physician. The breastbone of a man of mature age is about one-fourth of an inch thick, and it would take a blow of considerable force to drive a knife through it. Witness does not think a man of ordinary strength could push a knife through, without striking with it. The blood would ordinarily follow the knife, if it should strike and cut the heart and be pulled out. The blood would be likely to spout out. The pocket-knife here exhibited could not have made the cut an inch wide by striking and pulling out straight, but would have had to cut after having been inserted, or with a cutting thrust. The same knife could not have made the wound four inches deep, unless a portion of the handle had been inserted, which would have made a contusion. Witness thinks the butcher-knife here exhibited could have made a cut one inch wide and four inches deep.

W. B. Burns testified that, in a conversation with him, shortly after the killing, Caroline detailed the affair to him substantially as she testified here.

It is agreed that the length of the blade of the pocket-knife here exhibited is two and one-half inches; the length of the handle of the same, three and one-half inches; and the width of the blade, one-half inch.

No brief for the appellant.

*Thomas Ball*, Assistant Attorney-General, for the State.

Winkler, J. The appellant was tried and convicted of murder in the second degree, for the alleged murder of Robert P. McKennie, committed in Grayson County on the twenty-sixth day of January, 1878, and his punish-

ment was assessed at confinement at hard labor in the State penitentiary for a period of ninety-nine years. A motion for a new trial was made, and being refused, this appeal is taken. At the request of one of the counsel for the accused, appointed to defend him in the District Court, the appeal is returned to this, the Galveston, branch of the court. The transcript of the record was filed in this court on January 22, 1879, but so far there has been no appearance entered for the appellant, either by brief or otherwise, and on behalf of the State the matter is submitted to the court without comment; so that we are left to examine and pass upon the merits of the case, and the legality of the proceedings under which the appellant has been tried and adjudged guilty of a high crime, and the severe punishment imposed, from the transcript alone, without the aid of counsel, or even an assignment of error.

The first subject presented in the record for consideration is raised as to the ruling of the court in refusing to sustain exceptions or challenges to certain jurors, summoned to supply a deficiency after the regular *venire* had been exhausted, on the ground that they had been summoned in violation of the jury law of 1876. By sect. 23 of the act (Acts 1876), directions are given as to the manner of obtaining a special *venire;* and therein it is, among other things, provided for supplying any deficiency arising under the circumstances stated. This proviso is appended to the section, to wit: " *Provided,* that in supplying the deficiency it shall not be lawful for the sheriff, or any other officer, to summon as a juror any person found within the court-house or yard, if they can be had elsewhere."

It is shown by bills of exception that one juror, when he was summoned by the sheriff, was " within twenty feet of the court-house, on the court-house square ; " that another juror " was summoned while sitting, in company with other gentlemen, upon the railing around the public court-house well, on the court-house square, within twenty or thirty feet

of the court-house, there being no inclosure around the court-house or public square.'' Three other jurors were found by the sheriff on what is known as the court-house square in Sherman, Texas, — one of these stating, when being examined on *voir dire*, '' that he had lived in Sherman for some time, and that the population of said city of Sherman was eight or ten thousand, and that when he was summoned he saw a good many men around town.''

The particular causes of challenge are stated in the bill of exceptions to be, 1st, that the jurors were found on the court-house square, which is the court-yard, there being no inclosure around the court-house; 2d, that the jurors were found among and taken from the bystanders, and not from the body of the people; 3d, that jurors could have been found elsewhere; 4th, that it was unlawful for the sheriff to summon jurors found in the court-yard, or court-house square, when they could be found elsewhere.

The judge who presided at the trial, in giving a bill of exceptions to his ruling in refusing to sustain the defendant's challenge to these jurors for cause, appends the following explanation of his ruling, to wit: '' The court-house is situated in the middle of the public square, which is not inclosed, and is four hundred and thirty-two feet in width and breadth, besides twelve feet sidewalk next to the houses surrounding the square, making the distance of four hundred and fifty-six feet between the houses opposite to each other and situated on the square. The court-house is not inclosed, and in the public square the people assemble to sell all kinds of produce. It is used as a public market-place for all kinds of country produce, such as cotton, corn, wheat, oats, wood, etc., and is the common place of resort for vendors and purchasers of such articles. Besides, auctioneers carry on their auctions every day on the square, and were engaged in this business at the time the jury was summoned. The jury was made up before the defendant had exhausted his challenges allowed him by

law. He had six challenges left when the jury was completed. I also overruled the objections to the jurors, on the ground that this cause of objection is not one named in the statute on the subject."

We are of opinion that the court did not err in overruling the objections to these jurors, and that the places where the jurors were when summoned on the jury were not within the letter, and certainly not within the spirit, of the law cited above, which prohibits the officers from summoning persons found in the court-house or yard. Statutes of this character are enacted for the purpose of securing fairness and impartiality in jury trials; and that particular portion under consideration is believed to have been passed in order to prevent the officer whose duty it is to act under it from summoning for the jury those who, from interest or design, should place themselves in convenient positions in order that they may be summoned and taken upon the jury, or to guard against those who have been denominated professional jurors.

The jurors in this case were not found in the court-house, where we would ordinarily expect to find those who desired to have themselves summoned on the jury from an unworthy and improper motive, and cannot be said to have been summoned from the bystanders, but from the body of those liable to perform jury-service when legally called on for that purpose. If the objection would hold good as to a few persons summoned to serve as jurors for a particular purpose, they being found in an uninclosed public square, of the size of that described by the judge, in a city of from eight to ten thousand inhabitants, and the general market-place, it would doubtless greatly impede the administration of the criminal law in that county. The distance from the court-house to such a place within which a juror could not be summoned would be difficult to fix. It could hardly be contended that a person found within this court-house square could be said to be in the *yard* of the court-house, in the sense mentioned in the statute.

This objection not being found among the causes for challenge enumerated in the statute, we are inclined to the opinion that it should be regarded as directory, unless it should be shown that a contrary rule would tend to deprive one accused of crime of a fair and impartial trial. It does not appear that this appellant was deprived of a fair trial, or that his case was in any manner prejudiced by the ruling of the court, or by the presence on the jury of these jurors, or either of them. On appeal, this court would not be warranted in setting a conviction aside on a purely technical ground, which involved no material right of the accused. *Johnson* v. *The State*, 4 Texas Ct. App. 269. Even the fact that one who was not a competent juror had sat upon the jury would not be ground sufficient to grant a new trial or to reverse a judgment on appeal, if the fact could have been discovered, when the jury was empanelled, by the use of proper diligence. *Roseborough* v. *The State*, 43 Texas, 570; *O'Mealy* v. *The State*, 1 Texas Ct. App. 180. This disposes of the several bills of exception taken at the trial below.

The first and second grounds set out in the motion for a new trial relate to the rulings of the court as shown by these bills of exception, and need not be further noticed here. The third ground of the motion is, that the court erred in refusing to give the charges asked by defendant.

The charges which were asked by counsel for the accused were evidently prepared with care, and in most of them are enunciated correct legal principles; but, because some of them are inapplicable to the facts proved on the trial, and because others are deemed inaccurate, and too favorable to the accused, but principally for the reason that the general charge appears to be full and ample, we find no material error in refusing to submit them to the jury as the law of the case.

The fourth, fifth, and sixth grounds of the motion relate mainly to the sufficiency and legality of the evidence. The

second ground of the motion is thus set out : "Because the charge of the court to the jury as to the corroboration of an accomplice was not full, and was calculated to mislead the jury." The charge on this subject was as follows : —

"If you believe from the evidence that the witness Caroline McKennie was concerned or engaged in the killing of Robert P. McKennie, or encouraged by words or aided by acts any one else in killing him, then, in order to convict upon her testimony, it must be corroborated by other evidence in each material fact necessary to convict him, and such corroborating testimony must connect him with the killing. Such corroborating evidence may be either direct or circumstantial."

To our minds, if this charge is subject to criticism, it is in being more favorable to the accused than the testimony warranted, and we are of opinion that the appellant had no just ground of complaint.

As to the charge of the court, it seems that great pains were taken to give the accused the full benefit of all the law of the case, in a fair and favorable light for the accused, and to properly instruct the jury as to the law applicable to every legitimate view they could take of the evidence, which it was the duty of the court to do ; and, having done this, the demands of the law upon him were satisfied. We have not deemed it important to consider specially the charge of the court as to the subject of murder in the first degree, nor those asked by the counsel for the accused on the same subject, for the reason that the conviction is not for that grade of offence, but for murder in the second degree. Some of the charges given appear to be more favorable to the accused than the testimony warranted ; but of this the appellant cannot be heard to complain. It is evident from what appears in the record that the court appointed able counsel to defend him, and that they have in an able manner conducted his defence on the trial.

After a careful and thorough examination of the case as

shown by the record, we are of opinion the guilt of the appellant was fully shown by the testimony, and that all the proceedings were conducted with a proper regard for the solemnity of the occasion, the law applicable to it, and the legal rights of the appellant. No such error has been committed on the trial as would have justified the granting of a new trial, or as would warrant this court in disturbing the verdict of the jury and the judgment of the court; and therefore the judgment must be affirmed.

*Affirmed.*